IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOY OVERDORF, | CIVIL ACTION – LAW |
| Plaintiff | |
| | NO. 4:05-CV-2155 |
| vs. | |
| | COMPLAINT FILED 10/21/05 |
| CLINTON COUNTY SOLID WAYNE TOWNSHIP LANDFILL; JAY ALEXANDER, Individually and as General Manager of the Clinton County Solid Waste Authority and / or Wayne Township Landfill, | JUDGE: MUIR |
| | ELECTRONICALLY FILED |
| | JURY TRIAL DEMANDED |
| Defendants | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.   PROCEDURAL HISTORY

Plaintiff, Joy Overdorf, filed her Complaint on October 21, 2005, alleging violations of 42 U.S.C. § 1983 and the First Amendment to the United States Constitution, and the law and common law of Pennsylvania regarding wrongful discharge. Defendant has filed a Motion for Summary Judgment, a proposed

Statement of Material Facts, and a 34-page Brief in Support, which exceeds the limitations of Local Rule 7.8(b), and Defendants did not seek court approval to so exceed the page limitation of that Local Rule. In addition, contrary to Local Rule 7.8(a), Defendants' Brief does not contain a procedural history of the case, a statement of facts, nor a statement of questions involved. In addition, Defendants' Brief makes an argument for dismissal of a Pennsylvania Whistleblower Law claim when, in fact, Overdorf's Complaint contains no such claim.

Overdorf agrees to dismissal of her Pennsylvania common law wrongful discharge claim, and respectfully submits this Brief in opposition to the remaining arguments in Defendants' Motion for Summary Judgment.

## II   FACTS

This case arises from a criminal investigation conducted by the Pennsylvania Office of Attorney General ("OAG") into illegal activities of the Defendants, by whom Overdorf was employed, and Overdorf's claim that she was terminated by Defendants for providing truthful information to the OAG regarding the illegal activity. Ultimately, Defendant Alexander, General Manager of Defendants, was charged with 119 counts of criminal conduct including misdemeanor violations of Department of Environmental Protection ("DEP") permits, felony unlawful use of a computer, felony tampering with public records or information, misdemeanor hindering of prosecution, and misdemeanor tampering with or fabrication of

physical evidence, and pled guilty to a misdemeanor charge of unlawful conduct in violating permit weight limitations and to a felony charge of tampering with public records, and pled no contest to a misdemeanor relating to allowing waste to come into the landfill after hours. (Exhibit 3).

The following facts are taken from Defendants' proposed Statement of Material Facts and Plaintiff's Response thereto, and the same are incorporated herein by reference as though fully set forth.

On April 15, 2002, the OAG conducted a raid at the Defendants' landfill. Overdorf was interviewed by OAG agents in the landfill parking lot on April 15, 2002. Alexander admitted that he was aware the agents had stopped Overdorf in the parking lot, and were with her in a group for, in his estimation, 15 or 20 minutes. Office Supervisor Williams testified that the next day Overdorf stated in her presence that the agents had stopped her in the parking lot. Overdorf was the only employee who had been interviewed by the OAG on the day of the raid on April 15, 2002, and the only employee who had therefore spoken with the OAG without counsel. Both Alexander and Watson, on approximately 3 occasions, expressed concern about what Overdorf may have told the OAG that day.

Thereafter, Alexander made statements, concerning the OAG investigation, that "they have nothing or they don't have anything," that the investigation was just a personal matter between he and DEP, and that "he was the one that would be

3

talking to DEP." Such comments were made in the presence of "most of the girls out front." Williams said "they don't have anything on us." Alexander stated that Bob Yowell, Director of Waste Management at DEP, was "out to get him." According to Overdorf, Alexander told her, "Everything the AG's Office is stating is a lie," that it was "personal issues" between Alexander and another individual, and that she should "listen to what I am saying and we will all be ok." He told her that "if we stuck together, we would all be fine." He instructed her specifically not to discuss certain hauler loads and vendors and their weights and use of hand tickets. Alexander questioned Overdorf about what she had told the OAG. Williams told her that she did not have to tell the OAG everything, that "we" preferred that she not tell the OAG everything, specifically told Overdorf not to discuss weigh tickets and tonnage, told Overdorf that they should "all stick together" and they "would get through this," and not to discuss anything with the OAG." Williams told Overdorf that the OAG's information was incorrect, and that Overdorf needed to listen to her. Alexander told her the same thing.

In addition, unlike the other employees, Overdorf had at least 4 - 5 interviews with the OAG. Alexander had been maintaining that the violations being investigated were "paperwork violations, but after Overdorf returned from one of the interviews by the OAG, she was stating in front of other employees that there was more involved including people, hauling companies, board members and

a DEP official. In fact, Alexander knew that Overdorf was correct, and that this was more than just "paperwork violations" as he had been maintaining, and that the investigation included whether board members were aware of and approved the unlawful use of hand tickets, the involvement of hauling companies, and whether a DEP official, Mr. Bittle, had been paid off.

Alexander testified he felt like Overdorf was a "cop," and that she was "a representative of the Attorney General's office sitting out there talking to people." Despite his knowledge of the scope of the investigation and that Overdorf was correct in her description, Alexander called Overdorf into his office and tried to maintain that the "violations were on paper, so they [OAG] didn't have anything else to deal with."

Co-worker Watson testified that there was more tension toward Overdorf "from everywhere" at the landfill after the April 15, 2002 interview of Overdorf by the OAG, and that it "wasn't as laxed as it had been" for Overdorf. Overdorf testified that shortly after the April 15, 2002 OAG "raid," Williams' attitude toward her changed and Williams became more distant, and "everything that I did was a problem," and Williams began giving Overdorf Employee Discussion Forms and calling Overdorf back into Williams' office for discussions regarding alleged problems. Williams blamed Overdorf for errors in front of all the female office employees. Williams took duties from Overdorf and had another employee double

check her work. Williams did not invite Overdorf to a clean up that Overdorf expressed an interest in attending, and did not allow her to attend a computer training she had been scheduled to attend. Overdorf was left alone to work at the scales more than other employees. Overdorf had to "jump through hoops" to get a day off. Williams spoke about Overdorf behind her back. Overdorf was made to feel as if she were no longer "a part over there" at the landfill.

Plaintiff's Response to Defendants' Proposed Statement of Material Facts details how the disciplinary actions and complaints against Overdorf were unfounded and/or not timely related to her termination, and how she was treated differently than other employees after the April 15, 2002 raid and leading up to her termination, including how Williams would allow employees, including herself, to engage in extended personal activates during work hours without penalty, and Plaintiff incorporates that Response by reference as though fully set forth herein.

III.   ARGUMENT

   A.   Overdorf's First Amendment freedom of speech claim

Overdorf asserts that she has adduced sufficient genuine issues of material fact that her speech was a substantial or motivating factor in the decision to terminate her that summary judgment should be denied. Both Alexander and Williams expressed concern about what Overdorf said to the OAG agents. Williams' treatment of Overdorf changed dramatically and negatively after

Overdorf's interview by the OAG during the raid of April 15, 2002. Williams, of course was the primary disciplinarian of Overdorf leading up to her termination. Co-worker Watson corroborated the increased tension toward Overdorf and that things weren't as "lax" for Overdorf as before.

Both Alexander and Williams attempted to interfere with what Overdorf might say to the OAG. Alexander told her, "Everything the AG's Office is stating is a lie," that it was "personal issues" between Alexander and another individual, and that she should "listen to what I am saying and we will all be ok." He told her that "if we stuck together, we would all be fine." He instructed her specifically not to discuss certain hauler loads and vendors and their weights and use of hand tickets. Alexander questioned Overdorf about what she had told the OAG. Williams told her that she did not have to tell the OAG everything, that "we" preferred that she not tell the OAG everything, specifically told Overdorf not to discuss weigh tickets and tonnage, told Overdorf that they should "all stick together" and they "would get through this," and not to discuss anything with the OAG." Williams told Overdorf that the OAG's information was incorrect, and that Overdorf needed to listen to her. Alexander told her the same thing.

When Overdorf returned from an OAG interview, Alexander was obviously upset that Overdorf was telling the truth about the scope of the OAG investigation when Alexander had been attempting to maintain that it was just a matter of

"paperwork violations." At that point, Alexander began to view Overdorf as a "cop" and "a representative of the Attorney General's office."

Although Defendants have tried to argue that other employees who were interviewed by the OAG were not retaliated against nor terminated, there are substantial differences in circumstances. Overdorf was the first and only employee interviewed during the raid and without counsel. Unlike other employees, Overdorf was interviewed 4 – 5 times. Overdorf spoke about the true scope of the OAG investigation when Alexander was untruthfully maintaining that it was merely "paperwork violations." Alexander and Williams attempted to influence the information Overdorf gave to the OAG. And once again, Alexander viewed Overdorf as a "cop" and "a representative of the Attorney General's office."

Defendants also have attempted to argue that they had legitimate reasons to terminate Overdorf based upon the disciplinary actions and complaints about her. However, as detailed in Plaintiff's Response to Defendants' Proposed Statement of Material Facts, not only does Overdorf deny the alleged conduct, there are genuine issues of material fact as to whether the alleged conduct occurred, whether the alleged conduct occurred as frequently as originally implied, whether the alleged conduct is timely related to Overdorf's termination, and whether other employees were treated differently based on similar alleged conduct.

Therefore, Overdorf asserts that she has adduced sufficient genuine issues of material fact concerning her freedom of speech claim, and summary judgment should be denied.

B.  The official and individual capacity claims against Alexander

First, regarding Defendants' official capacity argument, reliance on <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 109 S. Ct. 2304 (1989), is misplaced because that case concerned whether a state is a person. Defendants herein are not a state but a municipality which has been held to be a person. <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 98 S.Ct. 2018 (1978). Secondly, even a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." <u>Kentucky v. Graham</u>, 473 U.S. 159, 167, n. 14, 105 S. Ct. 3099 3106, n. 14 (1985); <u>Ex parteYoung</u>, 209 U.S. 123, 159-160, 28 S. Ct. 441, 453-454 (1908). Alexander is not being sued for money damages in his official capacity.

Regarding the individual capacity claim, the Defendants argue whether Overdorf's termination was "<u>so clearly due</u> to her protected speech that no reasonable official would have believed his actions were lawful." (Emphasis supplied) This, however, is not the test. The test is "whether a reasonable official knew or should have known that the alleged action violated the plaintiff's rights."

9

<u>Rouse v. Plantier</u>, 182 F.2d 192, 196-197 (3d Cir. 1999).  Given all of the evidence discussed above, Overdorf asserts that because there are genuine issues of material fact as to whether her speech was a motivating or substantial factor in her termination, and because Alexander terminated her, there are consequently genuine issues of material fact as to whether he knew or should have known that the termination violated Overdorf's rights, and summary judgment should be denied.

      C.    <u>Punitive damages</u>

Overdorf agrees that the punitive damages claim may be dismissed against the municipal Defendants and Alexander in his official capacity, however, punitive damages are available against Alexander in his individual capacity, and, therefore, that claim should not be dismissed on summary judgment.  <u>Grimm v. Borough of Norristown</u>, 226 F. Supp. 2d 606, 659 (E.D. Pa. 2002).

                                RIEDERS, TRAVIS, HUMPHREY, HARRIS,
                                    WATERS & WAFFENSCHMIDT

                                <u>s/ Jeffrey C. Dohrmann</u>
                                Jeffrey C. Dohrmann, Esquire
                                Attorney for Plaintiff
                                161 West Third St., PO Box 215
                                Williamsport, PA 17701
                                PA Bar No. 68870
                                Tel: (570) 323-8711
                                Fax: (570) 323-4192
                                E-Mail: jdohrmann@riederstravis.com

## **CERTIFICATE OF SERVICE**

AND NOW comes Jeffrey C. Dohrmann, Esquire, Attorney for Plaintiff, and certifies that Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment has been served upon Barbara A. O'Connell, Esquire, Sweeney & Sheehan, 19th Floor 1515 Market Street, Philadelphia, PA 19102-1983, this 28th day of June, 2007, by ECF or, if necessary, by first class mail postage prepaid.

RIEDERS, TRAVIS, HUMPHREY, HARRIS,
WATERS & WAFFENSCHMIDT

__s/ Jeffrey C. Dohrmann_____
Jeffrey C. Dohrmann, Esquire
Attorney for Plaintiff
161 West Third Street, PO Box 215
Williamsport, PA 17701
PA Bar No. 68870
Tel: (570) 323-8711
Fax: (570) 323-4192
E-Mail: jdohrmann@riederstravis.com